# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Charles Adams, Karen Adams, James R. Allen, Elaine W. Allen, James Andrus, Alana Conrad-Andrus, Fred Aueron, Barbara Lee, Stan Bandur, Cynthia Bandur, Thomas Barrile, Linda Barrile, Larry Barton, Phyllis Barton, Edward S. Bender, Erick Berquist, Marilyn Berquist, Electa Bessler, Bill Borchert, Mary Borchert, Carl Bossenbroek, Scott Brady, Beth Brady, John Brannigan, Jean Brannigan, Lowell Bridges, Kimberly Bridges, William J. Brothers, Ruth Ann Brothers, Gerald Brown, Carol Ann Brown, Charles Bryson, Mary Bryson, Walter Burke, Martha Burke, Martin Bush, Carol Bush, Thomas Caracciolo, Amelia Caracciolo, Joseph Caravello, Halina Caravello, Robert Coleman, Roubina Coleman, Mary Zanis Crosby, Duwamish Head, George Daubek, Cathering Daubek, Davidson and Groode Childrens Irrevocable Trust, George Davis, III, Guy De Boo, Julio DeIbarra, M. Elena DeIbarra, Raul Deju, Shari Deju, Charles Deutschman, Cheryl Hines, Fred Dieterle, William Donahoe, Connie Donahoe, Allen Dube, Dana Duke, Alistair Duke, Peter Eckle, Shirley Eckle, Jerald Entin, Susan Stern-Entin, Mitchell Esquibel, Henry Farber, Amy McGinnis, Kenneth Farley, Donna Fassero, Melodee Fassero, Felicia Feder, Douglas Fehr, David Fisher, Dolores Fisher, Rolland Fitzgerald, Barbara Fitzgerald, Laurie Fitzpatrick, Brian Fitzpatrick, David Fraley, Richard J. Fuller, Jr., David Garber, Judith Garber, Phillip Garcia, Kathryn Garcia, Bonnie Garfinkel, David Garfinkel, Ronald Ghrist, Janet Ghrist, Gabrielle Glore, Barry Goldenberg, Susan Goldenberg, Todd Goldman, Thomas Goodnight, Mary Goodnight, Donald Gross, Lana L. Gross, Jon Hall, J. Mark Hill, III, Michael Hu, Ginger Hu, Peter Huang, Loretta Huang, Claude Hulet, David Hunter, Danuta Hunter, Jeff Iverson, Lorie Iverson, Thomas Jones, Ramona Jones, David Jordon, Madelyn Jordon, Adele Kaferly, Loren Leys, Michael Kalson, Larry Kane, Cindy Kane, Elizabeth Karas, George Kartalis, Kathy Kartalis, Andrew Kaskel, Leslye Kaskel, Jim Kaufman, Kim Kaufman, Gerald Keller, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 10 cv 3264 <br><br> JURY DEMANDED |

Barbara Keller, Lawrence Kessler, Hope Kessler, Murray Kowalsky, Marta Kowalsky, Lee Jay Y. Kuo, Lewis Kramer, Judith Kramer, CG Lazaroff, Daniel Leeks, Tamara Leeks, Nancy A. Lyon, Nancy A. Lyon 1995 Trust, Shani Magosky, Haywood Martin, Catherine Martin, Jerald C. Maryles, Milta R. Maryles, Richard Masilotti, Nancy McGurk, Gary Medwid, Susan Medwid, Jean Menner, William Menner, Deb Miller, John Miller, Garth Milne, Kathryn Milne, Eugene Minsky, Bonnie Minsky, John Moellering, Mary Burtelow, James Muller, Joanne Muller, Joseph Murray, Gary Musselman, Timmothy Mussleman, Staci-Ann Musselman, John Neff, Elizabeth Neff, Jeffrey Newman, Kimberly Norman, Angel Norman, Jenny Notte, Lisa Novick-Eckhardt, Ronald Nyeholt, Jose L. Ortiz, Michell F. Ortiz, Jay Patel, Gregory Pearson, Alice Pearson, Russell Pease, Jr., Soni Leighton, Steven Levine, Pamela Levine, Phyl A. Ray, Sandra Refoy, Brian Refoy, Thomas Reider, Kerry Roades, Cookie Pangilinan, John Robinson, Sandra Robinson, Gerald Romani. Jr., Tommy Rupert, Christine Rupert, William Rush, Darby Rush, Arturo Sapida, Lisa Sapida, Martha Sauter, Matina Scanlan, John Schaus, Stacy Schaus, Jack Schechtr, Lois Schechter, Richard Seiler, Judy Seiler, Mary Serafin, Ellis Sharp, Ellen Silverberg, Harvey Silverberg, Deborah Soutar, Roni Spielfogel, Joel Spiefogel, Norman St. Jean, Benjamin Stephens, John Stern, Joel Pesin, Susan Pesin, John Radick, Sheri Radick, Kristine Steward, Ronald Storzbach, Virgina Storzbach, Jerome Szott, Trish Thompson, Jack Thompson, Cheryl Thompson-Wilson, Gary Tonnies, Catherine Tonnies, Richard Toomy, Mary L. Toomy, Randall Verrue, Sandra Verrue, Robert Ward, Jeannie Ward, John Weber, David Weisbaum, Sonia Weisbaum, Gary Weiss, Amy Weiss, Ann Wertzberger, Cathy Weyand, Eileen Hoxit, Carole L. White, Jean Louis Caron, Laurel Winzler, Ian Wood, Anthony Wonski, Beth Wonski, Anthony Wyatt, Susan Wyatt, and Cheryl Yeager;   )

        Plaintiffs   )

v.   )

| | |
|---|---|
| Raintree Vacation Exchange, LLC, Raintree Resorts | ) |
| International, Inc., Raintree Vacation Club, CR Holding | ) |
| and Doug Bech, Starwood Vacation Ownership, | ) |
| Starwood Vacation Properties, Strwood Hotel and | ) |
| Resorts, Inc., Starwood Resorts and Hotel, Sergio Rivera, | ) |
| Michael H. Glazer; Goodwin Procter, LLP | ) |
| | ) |
| Defendants | |

# FIRST AMENDED COMPLAINT

NOW COME the Plaintiffs, Charles Adams, Karen Adams, James R. Allen, Elaine W. Allen, James Andrus, Alana Conrad-Andrus, Fred Aueron, Barbara Lee, Stan Bandur, Cynthia Bandur, Thomas Barrile, Linda Barrile, Larry Barton, Phyllis Barton, Edward S. Bender, Erick Berquist, Marilyn Berquist, Electa Bessler, Bill Borchert, Mary Borchert, Carl Bossenbroek, Scott Brady, Beth Brady, John Brannigan, Jean Brannigan, Lowell Bridges, Kimberly Bridges, Gerald Brown, Carol Ann Brown, Charles Bryson, Mary Bryson, Walter Burke, Martha Burke, Martin Bush, Carol Bush, Thomas Caracciolo, Amelia Caracciolo, Joseph Caravello, Halina Caravello, Robert Coleman, Roubina Coleman, Mary Zanis Crosby, Duwamish Head, George Daubek, Cathering Daubek, Davidson and Groode Childrens Irrevocable Trust, George Davis, III, Guy De Boo, Julio DeIbarra, M. Elena DeIbarra, Raul Deju, Shari Deju, Charles Deutschman, Cheryl Hines, Fred Dieterle, William Donahoe, Connie Donahoe, Allen Dube, Dana Duke, Alistair Duke, Peter Eckle, Shirley Eckle, Jerald Entin, Susan Stern-Entin, Mitchell Esquibel, Henry Farber, Amy McGinnis, Kenneth Farley, Donn Fassero, Melodee Fassero, Felicia Feder, Douglas Fehr, David Fisher, Dolores Fisher, Rolland Fitzgerald, Barbara Fitzgerald, Laurie Fitzpatrick, Brian Fitzpatrick, David Fraley, Richard J. Fuller, Jr., David Garber, Judith Garber, Phillip Garcia, Kathryn Garcia, Bonnie

Garfinkel, David Garfinkel, Ronald Ghrist, Janet Ghrist, Gabrielle Glore, Barry Goldenberg, Susan Goldenberg, Todd Goldman, Thomas Goodnight, Mary Goodnight, Donald Gross, Lana L. Gross, Jon Hall, J. Mark Hill, III, Michael Hu, Ginger Hu, Peter Huang, Loretta Huang, Claude Hulet, David Hunter, Danuta Hunter, Jeff Iverson, Lorie Iverson, Thomas Jones, Ramona Jones, David Jordon, Madelyn Jordon, Adele Kaferly, Loren Leys, Michael Kalson, Larry Kane, Cindy Kane, Elizabeth Karas, George Kartalis, Kathy Kartalis, Andrew Kaskel, Leslye Kaskel, Jim Kaufman, Kim Kaufman, Gerald Keller, Barbara Keller, Lawrence Kessler, Hope Kessler, Murray Kowalsky, Marta Kowalsky, Lee Jay Y. Kuo, Lewis Kramer, Judith Kramer, CG Lazaroff, Daniel Leeks, Tamara Leeks, Nancy A. Lyon, Shani Magosky, Haywood Martin, Catherine Martin, Jerald C. Maryles, Milta R. Maryles, Richard Masilotti, Nancy McGurk, Gary Medwid, Susan Medwid, Jean Menner, William Menner, Deb Miller, John Miller, Garth Milne, Kathryn Milne, Eugene Minsky, Bonnie Minsky, John Moellering, Mary Burtelow, James Muller, Joanne Muller, Joseph Murray, Gary Musselman, Timmothy Mussleman, Staci-Ann Musselman, John Neff, Elizabeth Neff, Jeffrey Newman, Kimberly Norman, Angel Norman, Jenny Notte, Lisa Novick-Eckhardt, Ronald Nyeholt, Jose L. Ortiz, Michell F. Ortiz, Jay Patel, Gregory Pearson, Alice Pearson, Russell Pease, Jr., Soni Leighton, Steven Levine, Pamela Levine, Phyl A. Ray, Sandra Refoy, Brian Refoy, Thomas Reider, Kerry Roades, Cookie Pangilinan, John Robinson, Sandra Robinson, Gerald Romani. Jr., Tommy Rupert, Christine Rupert, William Rush, Darby Rush, Arturo Sapida, Lisa Sapida, Martha Sauter, Matina Scanlan, John Schaus, Stacy Schaus, Jack Schechtr, Lois Schechter, Richard Seiler, Judy Seiler, Mary Serafin, Ellis Sharp, Ellen

Silverberg, Harvey Silverberg, Deborah Soutar, Roni Spielfogel, Joel Spiefogel, Norman St. Jean, Benjamin Stephens, John Stern, Joel Pesin, Susan Pesin, John Radick, Sheri Radick, Kristine Steward, Ronald Storzbach, Virgina Storzbach, Jerome Szott, Trish Thompson, Jack Thompson, Cheryl Thompson-Wilson, Gary Tonnies, Catherine Tonnies, Richard Toomy, Mary L. Toomy, Randall Verrue, Sandra Verrue, Robert Ward, Jeannie Ward, John Weber, David Weisbaum, Sonia Weisbaum, Gary Weiss, Amy Weiss, Ann Wertzberger, Cathy Weyand, Eileen Hoxit, Carole L. White, Jean Louis Caron, Laurel Winzler, Ian Wood, Anthony Wonski, Beth Wonski, Anthony Wyatt, Susan Wyatt, Cheryl Yeager through their attorneys, NOVOSELSKY LAW OFFICES and DAVID A NOVOSELSKY, and complaining against Defendants Raintree Vacation Exchange, LLC, Raintree Resorts International, Inc., Raintree Vacation Club, CR Holding and Doug Bech (the "Raintree Defendants); Starwood Vacation Ownership, Starwood Vacation Properties, Starwood Hotel and Resorts, Inc., Starwood Resorts and Hotel, and Sergio Rivera (the "Starwood Defendants); and Michael H. Glazer and Goodwin Procter, LLP ("the Goodwin" Defendants) allege as follows:

## FACTS COMMON TO ALL COUNTS

1. As of August 18, 1997, the Raintree Defendants (which encompass both the listed Defendants as well as the numerous real and sham corporate entities maintained and controlled by Douglas Bech) entered into an Operating Agreement with Defendant Starwood which entailed the cooperation and the operation, management, and control of various

facilities including but not limited to the Westin facility (wholly owned by Starwood) located in Los Cabos, Mexico.

2. At the same time, all of the Defendants entered into a Joint Operating Agreement and/or Plan to develop, acquire, and sell resorts to be converted into "Vacation Ownership Resorts" and "profitably sell Vacation Memberships at such resorts."

3. The agreement between the Defendants was to develop, market, and sell the properties including but not limited to the one eventually sold, marketed, and purportedly transferred to Plaintiffs.

4. At the time this Joint Development Plan and Joint Venture was entered into by the Defendants, Defendants advised the Security and Exchange Commission that the venture consisted of a group of wholly-owned subsidiaries, including one known as DTR.

5. Beginning in approximately 2004, Defendants, using one of their subsidiaries known as Club Regina S.A. De CV ("Club Regina") announced the sale of fractional condominium ownerships at a resort which was to be built in Los Cabos, Mexico. This project, alternatively known as Club Regina or the Residence Club at Grand Regina (hereinafter, "GR") offered various individuals the opportunity to purchase fractional ownership in the GR in fractions of 1/26 or more, opportunity to purchase those fractional interests said to be for a period ranging from a minimum of two weeks (a 1/26 interest) to full ownership of one of the then-announced 32-unit condominium development. Sales were nonetheless permitted by Defendants for a single week or a 1/52 share.

6. The overall costs of the development and construction of the project referred to above was in excess of $26 million dollars. Funding sufficient to build this project eventually secured through the sale of these fractional interests to a group of American citizens scattered throughout the United States, including but not limited to the States of Illinois, Texas, Florida, California, Kansas, and virtually every other state within the United States. Funds were collected from these individuals to provide the capital needed to build, develop, as well as maintain this project for its use as a resort by the purchasing owners.

7. At the time this project was announced and at the time the funds were collected, Defendants had no intention of actually building, completing, or making available to the fractional owners the project as announced. Instead, the capital secured from the sale of these fractional interests was taken by Defendants and dissipated. Defendants falsely claimed that it had been used by DTR, which they claimed was not under their control at the time, to pay "commissions" or other sales incentives to the employees/agents of DTR. Defendants also claimed to Plaintiffs that $10,000,000 of the funds had been used to pay a pre-existing indebtedness between these two groups of defendants, had been used to secure a means of shifting ownership to the Starwood Defendants, and otherwise dissipated by the Defendants. This was done to place the GRVO project into a position where Defendants later acknowledged to the unit owners that there were insufficient funds available to complete the project even before the projected date of completion.

8. Defendants specifically acknowledged to Plaintiffs that, as the project had not been built or completed as promised, they had an obligation to repay the initial purchase price

to the unit owners. Defendants claimed, however, that the supposedly newly "acquired" corporate entity responsible for this project had insufficient funds to repay the unit owners either their initial purchase amount or any interest for the loss of use of those funds which would otherwise be due and owing to the owners.

9. The unit owners then formed a Committee consisting of a number of unit owners to represent what was then referred to as the Grand Regina Villa Owner's Group ("GRVO" or the "Committee"). The Committee maintained its principal location during the 2008-2010 time period in Chicago, Illinois, and continues to do so through the present.

10. At the time the Committee was formed, an individual owner on that committee was, Mr. Michael Glazer. From time to time while a member of that Committee and communicating with various Committee members including those located in Chicago Illinois (where two of the six Committee members were resident and domiciled) Glazer, using the "letterhead" of his law firm, in his email communications, provided legal advice and counsel to the Committee, not simply as to various issues relating to the disputes between the unit owners, the Raintree Defendants, and the Starwood Defendants, but went so far as to assure the Plaintiffs that there was no need to hire outside counsel or consider a law suit. Glazer urged the Committee and individual owners – from time to time successfully – to accept various settlement proposals made by Raintree as well as to accept the good faith of various misrepresentations made by the Raintree and Starwood Defendants. Further, Glazer assured various Plaintiffs that Starwood would participate in settlement negotiations and eventual payments.

11. At the time the conduct of Glazer and his law firm as described in the proceeding paragraphs took place, Glazer did not disclose to any of the other owners nor the members of the Committee that his law firm had and was still actively engaged in representing the Starwood Defendants and their interests.

12. During the Summer of 2009, when the Committee engaged the services of an outside attorney, and in electronic communications as well as telephone communications with retained counsel in Chicago, Michael Glazer first disclosed the relationship of his law firm to Starwood. After being advised that counsel for the Committee believed that Glazer and his law firm had a conflict of interest, Glazer choose to withdraw from further participation as a member of the Committee.

13. At various times during 2008 and continuing through 2009, Defendants, both through their principals, employees, and at various times through their agents conducted negotiations aimed at resolving Defendants' obligations to repay and compensate the various unit owners through the Committee. Defendants made explicit promises to the various owners through the Committee as well as through direct solicitation to all of the unit owners requesting that the owners not file suit against Defendants, advising them that discussions were underway between the Defendants to secure adequate funding to repay or at least substantially compromise any loss suffered by the unit owners. Defendants repeatedly urged the individual owners as well as the Committee not to file suit, not to retain counsel, promising a series of meetings between the Committee and the Defendants would be held

intended to bring a resolution of this dispute over the obligation of Defendants to repay the unit owners to a conclusion without the need to hire counsel or initiate litigation.

14. The unit owners who are now the individually-named Plaintiffs in this law suit retained counsel and met with representatives of Defendants here in Chicago, Illinois in an effort to resolve this dispute. When that was not successful, Plaintiffs and the Committee advised Defendants that it was their intention to file suit before the Circuit Court of Cook County during the Summer of 2009.

15. Upon being so advised, Defendants retained counsel, in part, located in the City of Chicago. Eventually, an agreement was reached between counsel for Defendants and counsel for the Plaintiffs and the Committee that they would, simultaneously with the anticipated filing Plaintiffs' suit before the Circuit Court of Cook County, agreed to enter into mediation. The parties agreed to select the former Chief Judge of the Circuit Court of Cook County to conduct that mediation, mediation that was to proceed while the matter was placed into suit in Cook County.

16. After this agreement was reached, and after dates were being set for the actual mediation during the month of either August or September 2009, Defendants through their agents solicited to various individuals who are Plaintiffs in this litigation and attempted to convince them to ignore the advice of their counsel and the Committee and asked that these individual parties agree to settle the case outside the confines of the agreed upon court-annexed mediation.

17. The efforts described in the proceeding paragraphs took place in August of 2009, as set forth above, after the agreement to litigate in Chicago and engage in court-annexed mediation had been resolved. This effort was a continuation made by Defendants in late 2008 and continuing through and including the present time to solicit unit owners not to retain counsel, to "settle" and compromise their interests based on a claim of lack of funding and assurances of settlement payments made by all Defendants even though the Raintree Defendants knew that this was not true, after the Starwood Defendants ostensibly claimed that they would not participate in payments outside of the litigation process. This process of fraudulent representation was also made by Michael Glaser as an surreptitious agent of the Starwood Defendants.

18. While described in more detail *infra*, Defendants, including Mr. Bech, continued to solicit the unit owners not to file suit or hire counsel, and promising that a substantial settlement offer including the participation of the Starwood Defendants was forth coming so long as the unit owners did not retain counsel to advise them nor otherwise take steps to protect their interests. At all times relevant to this proceeding, the Starwood Defendants and the Goodwin Defendants knew that the statements being made by Mr. Bech and his agents and employees were false, but nonetheless aided and abetted the Raintree Defendants in attempting to settle or resolve claims brought by various unit owners and retrieve their fractional ownership shares. Defendants did so jointly in order for Defendants to profit from a redevelopment and reuse of the property in question which could not go

forward without obtaining the ownership interests of the Plaintiffs and other remaining fractional owners.

## PARTIES

19. Plaintiffs are all American citizens, with their domicile including but not limited to the State of Illinois. Each of them purchased or participated in joint purchase of fractional interests at the proposed resort facility.

20. The Raintree Defendants (which include not only the named entities but also include various entities which Defendant Bech uses indiscriminately and without regard for corporate identity) are corporations organized and domiciled for the purpose of doing business in various locations throughout the United States. Also included within these Defendants is a Joint Venture which was described in filings signed by Bech before the Securities and Exchange Commission as a Joint Venture with the Starwood Defendants and providing evidence that these corporations with regard to this particular project were intended to be considered as a unit by providing a Consolidated Financial Statement in the disclosure provided to the SEC (referred to hereafter as the "Raintree Defendants".)

21. The Raintree Defendants do business on a regular, systematic, and widespread basis in the State of Illinois by soliciting payments of various maintenance fees and other expenses from the citizens of the State of Illinois who own memberships at various Raintree Resorts, receive monies from these citizens of the State of Illinois by either direct deposit initiated from the State of Illinois or through checks or other similar payments sent from the State of Illinois using the United States mail.

22. Starwood (hereafter referred to as the "Starwood Defendants" both as individual entities as well as a member of the Joint Venture described above) also does business on a regular, systematic, and widespread basis throughout the State of Illinois. Starwood and its related and wholly owned entities including Westin maintain several large hotels and other facilities within the State of Illinois.

23. The Starwood Defendants also conduct business on a regular, systematic, and widespread basis in the State of Illinois when they solicit and obtain payments for various maintenance fees, and other payments related to various resort and vacation facilities that these Defendants maintain throughout the United States by obtaining these payments from numerous citizens of the State of Illinois either by direct deposit, or by payment made to these Defendants through the United States mail which is deposited at various locations throughout the State of Illinois.

24. All of the Defendants participated in a Joint Venture which, as described to the SEC, involved their joint decision to plan, acquire property, and then market vacation timeshare residences including but not limited to that at issue in the present case. This plan was developed and put into effect and eventually used successfully to sell these memberships in the project in question to various individuals located throughout the United States. That sale was consummated in part in the State of Illinois when Plaintiffs who are residents of and domiciled in the State of Illinois made their payments either by check or wire transfer which originated in the State of Illinois and were sent to at least two locations located within the State of California, United States of America.

## COUNT I

## **COMMON LAW FRAUD**

25. For Paragraph 1 of this Count I Plaintiffs readopt and realleges Paragraphs 1 through 24 as if fully set forth herein as this Paragraph 25, and complaining as to all Defendants, state as follows:

26. At the time the Defendants stated to Plaintiffs that their purchase fractional ownership in the Grand Regina Villas would allow them to make use of this project as a vacation facility, and that the fractional ownership they purchased through the solicitation and promises of these Defendants would allow the project to in fact be completed and made available for the use of Plaintiffs. Defendants knew these statements were false when they were made, intended that Plaintiffs rely upon these representations that the project would be completed and made available for their use upon payment, and knew Plaintiffs would make such payments based on their reasonable reliance on the truth of these representations.

27. At the time these statements were made, Plaintiffs reasonably relied upon their truth and accuracy and were thereby induced by reasonable reliance on the truth of these statements to make the payments in question to these Defendants.

28. At the time the statements were made by Defendants to Plaintiffs, Defendants knew these statements were false as they had no intention of completing the project. Defendants had already decided to take the vast majority of the money collected from Plaintiffs to pay what was ostensibly referred to as commissions or sales incentives to various agents and employees, to take a substantial amount of the money collected to pay off a pre-

existing debt to the Starwood Defendants, and otherwise reduce the amount of money available for the construction and completion of this project well below the level which they later admitted to Plaintiffs precluded the completion of the project.

29. Although Defendants both initially and through and including the present day have maintained that the "project" was marketed and sold by DTR, who Defendants maintained was an independent entity that was not "acquired" by one or more Defendants until some period of time between 2007 and 2009, as of 1997, DTR was in fact a wholly owned subsidiary of both the Raintree Defendants as well as under the control of the Joint Venture consisting of the Raintree Defendants and the Starwood Defendants.

30. In addition, although Defendants advised Plaintiffs through and including the present date that the sale to them of the ownership of these units had been done entirely at the initiative of and consummated by DTR, the actual sale as well as the acquisition of the purchase funds did not go to DTR but was instead taken by one or more of Defendants through one or more entities known or unknown located within the United States of America.

31. Contrary to the claims made by Defendants that all or part of the missing funds has in fact been "dissipated" or otherwise spent by DTR, those funds were never in the control of DTR and were instead acquired by and then disposed of by these Defendants without Defendants complying with their obligation to either complete the project in question or return those funds with appropriate interest and costs to Plaintiffs.

32. As a result of the false representations described in the proceeding paragraphs, which Defendants knew to be false at the time they were made, reasonably anticipated and

expected that Plaintiffs would rely upon those false representations to their detriment, and where Plaintiffs did rely upon those false representations to their detriment, Plaintiffs were defrauded by these Defendants, who thereby committed the tort of fraud.

33. As a result of the commission of this tort by Defendants, Plaintiffs have suffered the loss of the amount of money invested in this project, have further suffered loss of interest on and the use of these funds.

34. Following the initial sale of this project, and after it was announced by Defendants to Plaintiffs that the project could not be completed because the majority of the proceeds had supposedly been "dissipated" by DTR, leaving the supposed "successor entity" without sufficient funds to complete the project or return the monies, Defendants engaged in a series of written and verbal communications with Plaintiffs as well as the Committee formed by Plaintiffs to deal with Defendants to the effect that Defendants acknowledged their liability for the repayment of the initial purchase price, but proposed that Plaintiffs, working as a unit through the Plaintiffs' Committee located in Chicago, return their ownership and titles to Defendants by payment of a grossly reduced amount of money in addition to ownership in various Raintree or Starwood resorts. It was this scheme by Defendants to reacquire ownership of the land in question by insisting that the Plaintiffs' work as a whole and as a unit through the Committee located in Chicago to transfer ownership to Defendants and allow them to escape their admitted liability for the completion of this project and/or the repayment of the entire purchase amount.

35. This scheme was in part successful and took place through the communications and the meetings held in Chicago, Illinois on the dates described above as a portion of the owners did in fact transfer their titles to Defendants. This placed the remaining owners in a position where the value of their titles was reduced to the point of worthlessness, thereby allowing Defendants to successfully defraud these Plaintiffs yet again.

WHEREFORE, as a result of the conduct set forth above, Plaintiffs are entitled to judgment against these Defendants and each of them in an amount in excess of $125,000,000.00. In addition, Plaintiffs are entitled to the costs of bringing the suit, their attorney's fees, and punitive or exemplary damages in an amount in excess of $75,000,000.00 against each Defendant individually as well as jointly and severally.

## COUNT II

## MALPRACTICE – GOODWIN DEFENDANTS

36. For Paragraph 1 of this Count III Plaintiffs readopt and realleges Paragraphs 1 through 35 as if fully set forth herein as this Paragraph 36, and complaining against the Goodwin Defendants, state as follows:

37. Defendant Michael Glazer ("Glazer") both individually and as a representative of the law firm of Goodwin Procter, LLP, provided counsel and advice to the Plaintiffs, through membership in and advice provided to the Owners' Committee with the intended distribution of said counsel and advice to the Plaintiffs in this matter.

38. By providing this advice and counsel, and as he knew it was or was likely to be accepted as legal counsel and advice by the Owners' Committee as well as the Plaintiffs,

Glazer and Goodwin undertook to enter into an attorney-client relationship with the Plaintiffs.

39.     As a result of entering into this relationship, and as a result of undertaking the fiduciary obligations incumbent upon these Defendants acting as counsel for Plaintiffs, Defendants had a duty of undivided fidelity as to Plaintiffs

40.     Despite the duty of undivided fidelity described in the foregoing paragraph, these Defendants breached that duty by failing to disclose the pre-existing relationship of these Defendants and the Starwood Defendants, which precluded their entering into this relationship. They also urged and counseled Plaintiffs to engage in a detrimental course of conduct without disclosing their conflict of interest that precluded giving that advice and counsel, and otherwise acted in the best interests of the undisclosed Starwood Defendants while maintaining the façade that these Defendants were not acting as attorneys, for Plaintiffs.

41.     Based on the conduct of these Defendants, one or more unit owners choose to accept the representations and counsel made by these Defendants not to retain independent counsel, not to file suit, and otherwise accepted settlement advice to the detriment not simply of those other owners, but to the ultimate detriment of these Plaintiffs by placing into issue the possibility of a fair and equitable resolution absent the ownership interest of these other owners and the demand by the Starwood and Raintree Defendants that a "universal" settlement was the only acceptable alternative – thereby demanding that Plaintiffs settle this

cause of action on the same basis as the other owners who had followed the improper advice and counsel of these Defendants.

42. The conduct of these Defendants as described in the proceeding paragraphs was a violation of the obligation of these Defendants to represent or counsel Plaintiffs with undivided fidelity. Their failure to do so was a breach of their fiduciary obligations and duties as an attorney or a law firm and, as a consequence, they have committed the tort of malpractice with regard to the advice and counsel given to these Plaintiffs. That conduct has damaged the interest of Plaintiffs by adding to the case of resolving their disputes with the remaining Defendants.

WHEREFORE, as a result of the conduct set forth above, Plaintiffs are entitled to judgment against Defendants and each of them in an amount in excess of the minimum jurisdictional requirements for the filing of an action before the Law Division of the Circuit Court of Cook County.

                              Respectfully submitted,

                              By:   /s/ David A. Novoselsky
                                    Attorney for Plaintiffs

David A. Novoselsky (ARDC #02069881)
NOVOSELSKY LAW OFFICES
120 North LaSalle, Suite 1400
Chicago, Illinois 60602
(312) 346-8930